at all. And we have Mr. Glass for the appellant. And I see you reserved five minutes for rebuttal. So you can proceed whenever you're ready. Thank you, Your Honor. Brian Glass for Plaintiff We understand that protected speech in the First Amendment is a very complicated area. This court's seen a lot of these cases over the years. And I know Judge Bianco, I saw one of the cases cited was his. But in the context of law enforcement, district courts have thrown out at least three cases, Jackler, Matthews, and Montero. In this circuit, it reinstated all three of them. And I think in law enforcement, there's more of a trend to allow these cases to go to trial. Because we're really fundamentally dealing with fraud and misconduct in the context of law enforcement. I'm sorry, so you're suggesting that we apply a different standard for law enforcement? Well, I think it's found that fraud and misconduct in a police department has been found traditionally to be public speech. And those cases have been, this court has allowed these cases to go to trial and reversed, found this to be protected speech. And so this, even though the facts of this case are fairly complicated, and there's a tremendous record, at some, it's not really that complicated. What happened in this case was that Francis Brooke was basically relieved of his duties in the police academy because he had reported Steven Hubeck, the academy director, for engaging in fraud. You just used the word because, and that suggests cause. But it appears in the record, and I don't think it's disputable, that the training council voted to terminate his contract at the beginning of June. And he didn't make the statements that he claims he was entitled to make without retaliation until after. So it seems odd to have retaliation first, speech second. Well, there are a number of aspects of retaliation in this case. He was not really relieved fully from his duties and thrown out of the academy until- The technical problem, papers had to be signed, but he knew that there was a vote to terminate him. But he was not- And everything had followed from the fact that he was being terminated. Well, he had told Mr. Modica in March about some of these concerns. He didn't know the full impact. That statement doesn't fit the requirements. No, I understand that would not be the protected speech. No, it doesn't. It's not protected speech. It's in-house, and it's not the means of communication that people would use for public speaking, for public consumption. But the only time he was actually relieved of all duties from the academy, he was reinstated after that happened. And if you look at the narrative closely, if you look at the- He was reinstated because there was a technical problem with not signing the proper papers. The vote was taken, the handwriting was on the wall. Well, if this was- If you look at the timing closely, there was a lot of fact discovery in this case. Not until he went to Fiden on July 15th and July 22nd and started to disclose the public speech, did July 28th they make the decision that he had no further contact with the academy. So, yes, after the fact, they are playing these things that came out of discovery, saying June 9th, and we started down this process. If this was so urgent, why did they- Why was he reinstated by the county executive and not actually excluded from the academy altogether until July 28th? That fell on the heels of him starting to make reports to Fiden, which in discovering this case, the county did everything they can to prevent us from getting these reports, because the timing is extreme in this case. That you'll see that on July, if you read this record very closely- The fact that there's a very fat record doesn't mean that there's not a simple solution. And there's an enormous record, it means we have everything that matters here. Well, that has to do with causation, and that's a different element. I think the reason- Causation is an element. I'm sorry, I'm sorry? Causation is an element. No, I agree. But the reason we're here to- What if on the record, there's no causation? He's terminated, and then there was a problem with the termination papers, and it was fixed. And in the course of that, he was going around making statements that are of potential public interest and public importance. Not only potential- But he was fired, and then there was an effort. Yeah, he was reinstated because the papers weren't in order. Well, I believe that's one reading of the record, but there's another reading of this record that the July 28th final termination, or the complete suspension from the academy, occurred on the heels of what happened on July 15th and 22nd when he revealed about Hubeck's fraud and decertification. So that's for a jury. I agree there's a causation issue that a jury should decide, not a judge. But we're not here necessarily for that, because the judge below, Hal Perrin, had thrown this out on the public speech element. So I don't know if you want to focus on that. At least some of the contact with DCJS was back in April, right? When he was complaining, am I right about the timeline on that? He made some initial inquiries in April to DCJS to find out what's happening. And he did alert Modica to some concerns he initially saw about irregularities in the certification. So he had made some complaints earlier, I guess, right? He started to, he tried to make complaints to his immediate supervisor. I'm asking a different question. Sure. Assuming we don't agree with you that there should be a different standard for police officers, which I think would be quite extraordinary holding. I think the standard is if he's complaining as part and parcel of his worries that it's interfering with his duties, that then it's not private citizen speech, that's public employee speech. We would agree on that. I would agree, but I think that was dealt with by Judge Seibel, who made a determination on that. Well, that's what we said in Weintraub, that's how we- That's one of the factors, of course, yes. Well, that's the bottom line. There's a lot of factors, but the bottom line that we look at is, was it part and parcel of his concerns about his ability to perform his job? And I was quite struck by his May 2016 email to the President of the PCA, where he puts all the concerns in, and this is your clients saying, when he requested mediation because the deteriorating relationship between him and the director. He says, our collective goal is to have a professionally run police academy, and these concerns make it difficult. And he ends the email after he goes through the whole list, I'm hopeful that an understanding can be reached that will permit you, Beck, and myself to be able to successfully and respectfully work together for the betterment of the academy and its staff. And then he wrote a letter in July where he said to the sheriff that the actions were interfering with his attempts to perform obligations under his contract, so this is your client's voice, where he's essentially explaining why he's making these concerns, because he views it as interfering with his mission at the police academy. So why isn't that squarely in the part and parcel of his responsibility? Well, I believe Judge Seibel dealt with that issue, because we're not denying there were simultaneous motives, that he had conflict with Hugh Beck apart from the fraud and the misconduct allegations. But she dealt with that issue because she said part of the person who executed his job duties was not reporting fraud about- He said it doesn't have to be in the job description. It was clearly his view, based upon his own words, that all the things that he was reporting, whether they be fraud or something less than fraud, were part of his responsibility to make sure, in his position, that this was a professionally run police academy. But he was in charge of just the basic school, and I believe Judge Seibel dealt with this if you read her analysis closely. The question is, was it part and parcel, the speech of reporting misconduct as far as the DTI and the security guard? It's nothing to do with him. So the way she analyzed it, she said the part and parcel of the ability to perform his duties. Was the fraud that he was engaging in the security piece of this or the DTI part of his ability to execute his job duties with the basic school coordinator? Yes, he has some general idea that he wants to make the academy work, but he's not the boss. There's all sorts of evidence of things he did outside of his normal lane, that courses that he was involved in that weren't part of the basic school. There's- That was misleading, because everything that they cited had to do with his duties as a basic school coordinator. Now, there are things that involve, that might fall into Hubeck's role as well, because when you do things like certain trainings, you'll do for recruits as well as you might do for certified officers. So there was some overlap, but they're misleading when they're saying this is getting into his job duties. Hubeck has the contract to do DTI security guards. Brooke did not have part of those duties. So that's very convoluted. And if you read- The conduit that he used to make the complaints, he made them to the DCJS, which was an entity he was in constant communication with. If it's not like he went to the newspapers or to the mayor or somebody who he doesn't have any interaction with, that was his bread and butter, DCJS was who he spoke to all the time about his job, right? But there's testimony that he never spoke to Tom Canning from DCJS about security guards. He never spoke, he had very little contact, he had some contact with Maruso, but he never had contact with Tom Canning, who was the security guard guy. He never spoke to him from DCJS. And also that's missing, in the record, there's also indication that DCJS is open to the public. They have a 1-800 number. David Maruso testified during his deposition that, in fact, he has had complaints from the general public about certification and training and things of that nature. So, again, if you read the record closely, DCJS- Complaints to the public about uncertified instructors? Well, safety concerns about instructors- You said safety concerns now. Before you said complaints to Mr. Canning about the very issues that your client ended up complaining. It wasn't frequent, but Maruso did testify during his deposition that he had contact with the public about certain issues regarding police officers and safety concerns that the general public did have access to him as well. We also have the county attorney also- It's not exactly like the local newspaper. No, there's different degrees of it, but DCJS was not his boss either. It was outside of his chain of command. I don't think anyone's saying that DCJS is in his chain of command. It was to the county executive. He oversees academy training, and he does academy training, so why aren't they in the chain of command? But that's not his operational chain of command. It doesn't have to be in the chain of command. We've said in other cases that if it's someone you're, there was one case where I think it involved police officers actually, where they communicated with the DA's office constantly, I think it was called Anamone. And even though it's outside of the chain of command, the DA's office is not in the chain of command, we upheld that saying he communicated all the time with the DA's office as part of his job. So that wasn't an unusual line for him of communication. That's the point here. DCJS is hardly an unusual line of communications for your client. Well, with security guards, he wouldn't have access to that. And they also said that he had 26 years of contacts with DCJS, never about curriculum. And then the other issue is the county attorney as well. You have five minutes in rebuttal, so you're over your time, but you'll have plenty of time to add to it, all right? Thank you, thank you. Okay, I know we have a lot of people arguing, and I think we switched the order. So I think Mr. Weissman, I understand, is going to go first on behalf of the sheriffs, county of Rockland sheriffs. Yes, your honor. Good morning, your honors. May it please the court, Robert Weissman for defending Zappolese, Hubeck, Vancura, Falco, and the Rockland County Sheriff's Department. Judge Halperin's order should be affirmed for the reasons explained. However, before I go into the issue of protected versus unprotected speech, I think it's important to note that as a matter of law, this court can affirm on any basis supported by the record, including those that were completely unaddressed by Plaintiff's counsel. Critically, the issue of the timeline precluding any finding of causation, as Judge Jacobs alluded to earlier, the issue of qualified immunity, the issue of Hubeck's right to free speech, the Mount Healthy defense. All of these went completely unaddressed other than a point heading saying it should be remanded to the district court. But if we're going to decide on a causation, how would we deal with some of the complaints that were made prior to the decision to terminate? Which I guess was not final at that point even, but some of the complaints occurred prior to that, right? Some of the completely unknown complaints. The critical issue in terms of causation is whether the defendants knew of these complaints. They can't retaliate if they didn't know about it. And as Judge Jacobs indicated, and as Judge Bianco, you recently affirmed in a case called Morales, 2022 West Law 2840035. It was affirming a decision that we cited in our brief, decided in July 2022, as you stated, an employer's decision to proceed along lines previously contemplated. Is no evidence whatsoever of causality. That's critical in this case, because as Judge Jacobs noted, the decision to terminate and all the sequelae following therefrom began in June 9th, long before- When your episode says that that wasn't final, he was reinstated, and then he was fired again. Well, that's exactly the point of the Morales decision, where it says an employer's decision to proceed along lines previously contemplated. That's what this exactly is. As of June 9th, it was very clear from the record that it was contemplated that Brooke's performance was unacceptable and that his contract was going to be terminated. The fact that there was a paperwork glitch and they had to file the DCE 200 July 13th after the county executive directed him to be reinstated is immaterial because all of that was previously contemplated as discussed in the Morales decision just recently. That includes his suspension in July 28th, which included his banning from the academy grounds and from the firearms range. All of that are sequelae of the June 9th decision, which preceded any knowledge of his complaints to the county attorney and DCJS. And actually occurred before he went to the county attorney and before he put anything in writing to the DCJS by many, many months. In fact, I think that that is a critical point, that five month delay in putting anything in writing to the DCJS. He states that he knew of the security guard issue as early as May in his email to Chief Modica. And he describes this to DCJS in October as a felony, a class E felony. He's a police officer. Why is he sitting on this for five months if he was so interested in protecting the public? Really? Is the motivation though of the individual in making the speech, how does that factor into whether or not they're speaking as a- Yes, yes, Jersley. As a matter of law, that does factor into it, because there is case law routinely stating that even if something touches on a matter of general importance, is the language used. If it arises in the context of a personal dispute, an attempt to address personal grievances, as is clearly the case here, that it is not protected speech. When you're mixing a matter of public concern with whether or not it's public or private speech, what you're just talking about is a completely different issue, right? Those cases are trying to decide whether it's a matter of public concern or not, right? Well, it is- They said if it's a personal grievance, it's not a matter of public concern. I don't think they're going to be deciding that on this issue in this case, right? That's true. However, in the cases, they do discuss the issue of personal grievance in the context of whether it is a public concern or not, because if it's made in the context of personal grievance, then it's not being done out of concern for an issue that is of public interest and public concern. So the two in that respect are sort of intermixed. All right, thank you. I think we're going to hear from the County of Rockland. Thank you, Your Honors. Good morning, Your Honors. May it please the court. Darius Sheffazada with the law firm of Harris Beach for the respondent appellee, County of Rockland. Judge Halpern's decision of March 3rd, 2021 should be upheld. I think the record demonstrates as a matter of fact in law that the person here, Mr. Brooke, an FMB, did not speak as a citizen, rather as an employee. Going through the two-part test that this court has set out in numerous cases over the last decade after the Garcetti decision of the Supreme Court, that his comments to DCJS and or to the county attorney were part of his official responsibilities. Likewise, there's no specific civilian analog as demonstrated in the record. I know the discussion was briefly made about the chain of command. I would say that the county attorney's clearly within the chain of command. The first comment made about this was to the county executive who signed the contract with Appellant here, who was then- Does the contract set forth, make clear that the individuals he's reporting to are part of the chain of command? It does not, and I think the case law from the circuit has indicated that was not a determinative factor necessarily. You have to look at what, I think the words used is a practical approach. I think some of the language from the second circuit is. Practically here, the county executive signed the contract. He initially made the complaint to the county executive, who then had the county attorney look into the issue. So I think that would- So to the extent we're looking at what the conduit was, it wasn't the, he went to the county executive, which was the signatory of the contract, and then was referred to the county attorney. He didn't go to the county attorney directly, right? That's correct. Yeah, and the county attorney is the chief legal officer for the county and the county executive. So, and also with DCHS, there's reports throughout the record that Mr. Brooke and his company had detailed contact with the DCHS throughout the time concerning a number of issues, not just the basic school. I think there's a number of places in the record, and specifically in one of the briefs that go through four instances where Mr. Brooke was copied on emails related to security guard classes regarding DTI instruction, all prior to anything happening with respect to complaints about how the academy was being run by Mr. Hubeck. With respect to the element, I think this was part and parcel with his work at the academy, his complaints. I had the anemone case cited also. They made the regular reports to the DA's office there, and the regular reports to DCHS here. And I think Judge Halpern addressed for- What is that? Is it fair to characterize that as having been part of his duties, making the kinds of reports that he was making? About these other structures, or about what have you? Well, he regularly communicates with DCHS. If there's an issue with a class, issue with an instructor, issue with whether someone is certified, yeah, I think that is something that he did on a regular basis. As part of his duties, though, it's not just something, obviously, people can communicate with others inside the organizations for various reasons. Yeah, I think there's a number of emails in the record. I don't have the specific sites where there's actually, they're trying to change things about a specific class. And this is early on in January, February of 2016. So I think the record indicates that that was a specific issue that he would communicate with. Whether there were certifications, whether this was the right instructor, whether this person was certified or not. So I think the record does show that. I don't have the specific site at my fingertips, though. But there are a number of emails, I think, in the January, February, March time frame with DCHS on those specific issues. And Judge Halpern went through a number of elements in his decision. And I think one of the main things that was also discussed was the goal of running the professional academy that Mr. Brooke continuously said in emails and in letters throughout the time frame. And I think the time period is critical on the issue that was mentioned by your honor. The June determination and then the issues related to the paperwork and the DCE 200 that needed to be filled out. I think critical too is that this, I know not specifically related to the elements related to Judge Halpern's decision. But this was by and large a personal dispute between the two. And I think recently in the spec decision, where someone wrote a FOIL request subsequently. And I think the majority in that case said, well, it's simply creating an issue after the fact. What reason was given for not renewing the contract? There was a subsequent RFP that was issued. FMB submitted a response to that. There was a analysis of three different individuals did with different companies, including Mr. Brooke's company, and he was the lower for the grading. Does the records say why? Yeah, I think there's specific categories that were responded to. And there's a chart, I believe, of why FMB was a lower score in a particular area. Three people were doing this. Were they outside personnel types? Who were they working for? One of them was Mr. Vancouver. Yes. One of them was someone from purchasing, I believe. And the third one was Chief Barbera, I believe. Thank you. Okay, thank you, Your Honors. Now here, I believe it's Police Chief Association next. Ms. Healy. Good morning, Your Honors. May it please the court, my name is Siobhan Healy. We represent the Police Chiefs Association of Rockland County. To speak to the reference in the record that my colleague made mention to is on page 29 of our brief, we go through multiple examples of the ways in which Mr. Brooke engaged in duties that would not necessarily be contained with the confines of the basic school job description. And yet, he still considered them part of his job duties. In fact, one being emails on which he was copied that specifically related to the DT's instructor school. Another example of being emails with DCJS regarding a police refresher course curriculum. Again, not specifically part of his duties under the BSC contract. And then the last being where he was coordinating with DCJS regarding certificates of completion for specialized investigator courses. He considered these all part of his duties, notwithstanding the specific duties he outlined as part of his specific job description. And in fact, in his May 2016 memo that Your Honor made reference to earlier, when he lists the ways in which he feels he has fulfilled his responsibilities as the basic school coordinator, he lists among them arriving early to set up DCJS and teaching security classes. So the notion that he did not consider these part of his duties is belied by his own list of responsibilities. And the fact that, as stated, his goal was to have a professionally run academy. What is alleged as to how your client retaliated? Your Honor, the allegations here have been very muddled with respect to my client. I think- Put the best face. Understood, Your Honor. And I think the ways in which they were muddled, and I think it's important distinction to make, is that the PCA, the Police Chiefs Association, is not one and the same with the training council. The training council is comprised of four police chiefs and under Sheriff Vancura, who, like every police chief in the county of Rockland, is a member of the PCA. However, the PCA's, the scope of their duties and their purpose as an organization, is not to run the academy. That is done by the training council. I think the theory is that under Sheriff Vancura was essentially, in his communications about the termination, back and forth, was doing so through his membership in the- I think that is belied by the fact, and there is no reason to reach that conclusion, in light of the fact that under Sheriff Vancura was specifically, was a member of the training council. And like I said, every chief who is a member of the training council, like every chief in the entire county- You're saying there's no indication that he was doing this on behalf of the PCA? Correct, correct, your honor. I'm going to say, so every time there's reference to, well, PCA member so and so did this. Well, again, every chief is a PCA member. It doesn't actually draw it back- Your client selects the board members, but it seems to me that the allegations run against individual board members, but not against your client. That is certainly the conclusion, I would say, Judge Seibel reached, that there was no connection, factually alleged, even at the pleading stage, that there was any connection between the individual chief's actions, particularly those sitting on the training council and the police chief's association as a whole. Like your client is a tourist. Well, your honor, I think that the purpose of the organization is to have the chiefs come together to talk about issues that expand county-wide, that go beyond their individual jurisdictions, right? And certainly, in some respects, an academy could include those types of issues. But here, they do have an independent governing body who is the four chiefs and under Sheriff Van Cura. Thank you. Thank you. Next, we have counsel for Michael O'Shea, Ms. Collins. You have a whole minute, Ms. Collins. Thank you, your honors. May it please the court, Deanna Collins-Silverman and associates on behalf of Chief O'Shea. I want to take my time this morning to simply emphasize one point made in our brief, however critical it may be, which is that the appellants here have failed to argue any claim that was in any way erroneous, or any decision that was in any way erroneous, made with respect to my client, Chief O'Shea, who, of course, was dismissed pre-answer by Judge Seibel's decision. Appellant's brief is completely limited to discussing why Judge Halperin's decision on summary judgment was somehow erroneous. But obviously, Chief O'Shea did not participate in discovery. We did not even answer the complaint. And there is simply no reference to any of the issues that Judge Seibel found in her decision dismissing Chief O'Shea in appellant's brief, or even in the reply brief. Importantly, as Judge Seibel correctly found, the only speech that Chief O'Shea and the other individual defendants who were dismissed at the pleading stage could have been aware of that may have been protected was the speech that occurred in March of 2016 to Modica that the appellant made. However, the speech that appellant argues now on appeal before your honors is that the speech that occurred in April and July of 2016 to the DCJS and the county attorney is protected. And counsel came up even this morning and conceded to your honors that the March 16th speech was not protected speech. So for these reasons, as well as the reasons we discussed in our brief, we obviously request that the decision be affirmed. Thank you. Thank you, Congress. I should note for the record that Mr. Modica is on submission. And then the last one is Kevin Nolte, Mr. Goldberg, who also has one minute. Thank you, your honors. May it please the court, Jacqueline Goldberg from Keenan Bean on behalf of Defendant Appellee Chief Kevin Nolte. Like Chief O'Shea, I'm here just to say that there are no claims in the appellant's brief concerning Chief Nolte. It seems to us that he has abandoned any of his claims. He does not make any arguments concerning Judge Seibel's decision to dismiss the complaint as against Chief Nolte. And unless the court has any other questions. Nope, thank you. Great, thank you, your honors. All right, Mr. Glass, you've reserved your five minutes for rebuttal. And I do want you to address, Mr. Glass, I forgot to ask you, but it does seem like even though you filed a general notice of appeal against both decisions, the motion to dismiss and the summary judgment, when your briefs seem to be, you seem to say that Judge Seibel got it right in the motion to dismiss, that you're really just challenging what happened in summary judgment. Is that accurate? That's the heart of our appeal. Okay. And I think that- I'll take that as a yes. Go ahead. Well, I think the issue that should go to trial in this case is whether Mr. Brooks' speech disclosing fraud to the county attorney's office on July 15th and July 22nd, 2016, resulted in his expulsion from the academy on July 28th, 2016. He was reinstated. I know they're trying to say they were in process. Where was the rush to get rid of him until he made these reports to Hubeck? You're saying it resulted in his expulsion on what date? July 28th, 2016. And so, and in fact, after his first, there was a phone call in the record on July 19th, after his first contact on July 15th from Bankura who said, you know, we're going to move to get you out of the academy. It didn't happen until July 28th. The county executive was resisting this. He stayed. The county executive didn't even want to go along with this. What motivated his termination from this academy, and they keep talking about these personal disputes. I'm conceding there were personal disputes between them. But the law says it has to do with, is protected speech a motivating factor as to why Mr. Brooks is no longer working there? And it is. That's for a jury to decide. They can try to present evidence to say, oh, it was already in process and everything like that. We should be able to present evidence to show that we had Fidens admitting that she was being told. She even referred to the blue wall silence. She said, don't do this. The blue wall silence is going to go after you. This is classic misconduct, and no one seems to be upset by this. This fraud was found, and Hubeck is still there. My client is out of there. Why? I mean, they found the fraud. The fraud was established by DCGS. They found that, in fact, he had engaged in falsification of documents. He committed some kind of fraud, and my client is the victim here. If we look at this case, what should go to trial here is that Hubeck should be on trial with Incura as to whether they retaliated against him. And there's evidence that we have, this ample evidence that came out of the discovery that Hubeck knew everything that Fiden was told before he even was called to ask about it. And within days after, Brook was out. So I understand there's a lot of satellite issues, and you could turn this into that. At the end of the day, as Judge Lee recommended, noticed motivation is not why he made the speech is not really the issue here. And I think Judge Bianco also referred to the idea that at the end of the day, you have to decide whether this was protected speech. If you look at Seibel's decision versus Halpern's decision, it's the same facts. So why he just punted on the case, I don't even know why the case was reassigned. But it's the very same. Nothing came out of the discovery that altered her analysis. So at the end of the day, we would ask you to allow us to go to trial on the issue of whether Hubeck and Ventura retaliated against him because Mr. Brook made complaints of protected speech about fraud that was ultimately substantiated. And I think there are cases out there that this kind of case has gone to trial. So you can cut out, I understand there's a lot of people named in this case. And we had to do that because we didn't know all the facts until we got to discovery. But in discovery- But you haven't dropped any of them out. I mean, they're here. I understand. Right, I mean, you sued all these people. Discovery demonstrated to you that some of them have nothing to do with any of this. They have lawyers who have traveled down here to argue, and you haven't really bothered to drop them from the case. Well, there's evidence in the record, though, that they're using some retaliatory factors. And it is still murky as to what is Ventura's role as pieces- I thought you just admitted a moment ago that there's a whole bunch of people here that you named only because you didn't have any discovery to find out that they had nothing to do with this. No, there in fact is, there is evidence that Nolte was mad-mouthing him in coordination with some of these people who came forward more. Was revealing things to Hubeck after the complaints came out. Somebody was mad-mouthing him? They were revealing things that he was telling Fieden. Hubeck was getting, he was getting updated about what was happening, what Brooke was saying by some of the people on the PCA, on that council. So I do think, at the end of the day, I think that the strong- How can you say nothing came out of discovery? We have like 15 volumes of- Yes, and there was, well, I'm saying- Judge Seibel, first of all, Judge Seibel was on a motion to dismiss, and she said it was a close question about whether she let the case go forward at all. So, and then, for example, the email I read to you, you can correct me if I'm wrong, I don't think Judge Seibel could consider that email that your client wrote explaining why he thought all these grievances related to his job to make sure the academy ran smoothly. She didn't have that in front of her, right? I believe she had the main, she was aware it was a May 16th email, and she found that not to be protected speech in her analysis. I think what she focused on, that she allowed this to go forward, was she said, if he could prove that his complaints about, you know, other than the basic school were valid and contributed to retaliation. I believe she allowed that to go through, and I think if you read her, she goes into a very long analysis of all these factors. And I don't think anything in discovery changed that analysis. That's why it was done at the motion to dismiss. These defendants, you know, put up, a lot of them were dismissed, but they put, that's why she gives a very close analysis of this. And if you read her very closely, it doesn't make sense that Halpern would dismiss it on that basis. So, again, at the end of the day, I think the strongest claim would be, you know, Hubeck and Vancouver, where they retaliated against him for engaging in protected speech. All right, thank you. Thank you for your arguments, for reserved decision.